IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JUNO INVESTMENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-882-MN-CJB |
| | ) | |
| JOHN R. MILLER, ESQUIRE and | ) | |
| RAYBURN COOPER & DURHAM, P.A., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Presently pending before the Court in this legal malpractice action is a motion to dismiss the claims in Plaintiff JUNO Investments, LLC's ("Plaintiff" or "JUNO") Complaint (the "Motion"); the Motion is filed by Defendants John R. Miller, Esquire ("Mr. Miller") and Rayburn Cooper & Durham, P.A. ("Rayburn Cooper" and collectively with Mr. Miller, "Defendants"), pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(e). (D.I. 6) For the reasons set forth below, the Court recommends that Defendants' Motion be DENIED.

**I. BACKGROUND**

    **A. Factual Background**

        **1. The Parties**

Plaintiff JUNO is a Delaware limited liability company with offices in New York, New York. (D.I. 1 at ¶ 1) Phil Kampf ("Mr. Kampf") is the Managing Director of JUNO, and Mox Tan ("Mr. Tan") is also affiliated with JUNO. (*Id.* at ¶¶ 11, 17)

Defendant Mr. Miller is a bankruptcy and workout attorney who is licensed to practice law in North Carolina; he is a partner and/or shareholder in Rayburn Cooper. (*Id.* at ¶¶ 2-4)

Rayburn Cooper is a law firm and professional association of attorneys licensed to practice law in North Carolina, with offices in Charlotte, North Carolina. (*Id.* at ¶ 3)

## 2. Facts Relating to JUNO's Claims[1]

On January 3, 2018, Southeastern Metal Products, LLC ("SEMP"), South State Bank ("South State") and JUNO entered into an amended and restated loan agreement (the "amended and restated loan agreement"). (*Id*. at ¶ 12) Pursuant to that amended and restated loan agreement, South State extended credit facilities of up to $6.7 million dollars (including a line of credit) to SEMP. (*Id*. at ¶¶ 12-13) JUNO, who was SEMP's majority shareholder, (*id*. at ¶ 53(b)), served as a guarantor for SEMP's loan in the amended and restated loan agreement, (*id.* at ¶ 12).

In May 2018, SEMP began to experience liquidity problems. (*Id.* at ¶ 15) In March and April 2018, JUNO advanced $420,000 to SEMP, and from May to November 2018, JUNO advanced an additional $1.915 million to SEMP. (*Id.* at ¶ 16)

On September 26, 2018, Mr. Kampf and Mr. Tan sent a draft promissory note and security agreement (the "subordinated note") to Boodell & Domanskis, LLC ("Boodell & Domanskis"), a Chicago law firm that had regularly represented JUNO. (*Id.* at ¶ 17) The subordinated note provided for SEMP to repay JUNO, and to grant JUNO a security interest in SEMP's assets, which was to be subordinated to South State's existing security interests. (*Id.*)

---

[1] At the outset, the Court notes that (as will be seen below) the Complaint makes reference to a number of different agreements that are relevant to this case. The way that the Complaint makes reference to those various agreements (i.e., which agreement was sent by which party to which other party, or which party had or had not signed a particular agreement at a particular time) is confusing. The Court has done the best it can to try to set out the factual allegations in the Complaint in a manner that is linear and understandable. But in general (and when in doubt), it has deferred to the manner in which the facts are organized and described in the Complaint itself.

On October 9, 2018, Mr. Kampf sent South State the draft subordinated note for loans made by JUNO to SEMP in an amount up to $2,500,000. (*Id.* at ¶ 18)

On October 30, 2018, South State sent Mr. Kampf a proposed intercreditor agreement for review and comment, and requested that SEMP and JUNO sign the agreement. (*Id.* at ¶ 19) (Pursuant to the intercreditor agreement, South State was to consent to allowing SEMP to incur subordinated debt to JUNO—notwithstanding the presence of certain language in the amended and restated loan agreement that would have precluded SEMP from doing so.). (*Id.* at ¶ 24) Mr. Kampf and Mr. Tan forwarded the intercreditor agreement to Boodell & Domanskis for review. (*Id.* at ¶ 20) On November 29, 2018, Mr. Kampf returned the proposed intercreditor agreement to South State with comments, and requested that the subordinated note and intercreditor agreement be finalized as soon as possible. (*Id.* at ¶ 21) Mr. Kampf told South State that JUNO had loaned $2.335 million dollars to SEMP, and that JUNO would probably want to increase the $2.5 million cap on advances that was set out in the current draft of the subordinated note. (*Id.*) In or around this time, South State informed SEMP that it wanted to exit the existing credit arrangement it had with SEMP; South State suggested that, in the future, SEMP should seek financing from a different lender. (*Id.* at ¶ 22)

On December 10, 2018, SEMP and JUNO had an initial teleconference with Mr. Miller at Rayburn Cooper. (*Id.* at ¶ 23) During the teleconference, SEMP, JUNO and Mr. Miller discussed a proposed forbearance agreement that SEMP and JUNO might enter into with South State. (*Id.*)

On December 13, 2018, South State advised Mr. Kampf that it had approved the proposed intercreditor agreement and that South State would sign that agreement when a forbearance agreement between South State, SEMP and JUNO was finalized. (*Id.* at ¶ 24) On

3

that same date, December 13, 2018, SEMP sent a draft of the forbearance agreement that was forwarded to Mr. Miller; and JUNO sent the intercreditor agreement to SEMP for signature. (*Id.* at ¶ 25)

On December 14, 2018, Rayburn Cooper drafted an engagement letter (the "Engagement Letter") by which SEMP would formally engage Rayburn Cooper to provide legal services "in connection with [SEMP's] current lender negotiations and related matters." (*Id.* at ¶ 11; D.I. 7, ex. B) On December 17, 2018, Mr. Kampf signed the Engagement Letter on behalf of SEMP, "in his capacity as Managing Director of [] JUNO." (D.I. 1 at ¶ 26; D.I. 7, ex. B at 3)

On December 18, 2018, SEMP signed the subordinated note (which was backdated as of March 23, 2018), in favor of JUNO for loan advances in an amount up to $5 million dollars. (D.I. 1 at ¶ 27) The note acknowledged that JUNO had already advanced SEMP $2.335 million dollars between March and early November 2018. (*Id.*) On the same day, SEMP also signed the intercreditor agreement and sent it to South State pursuant to JUNO's instructions. (*Id.* at ¶ 28)

On December 31, 2018, JUNO sent the subordinated note and the intercreditor agreement (which was not yet signed by South State) to Mr. Miller. (*Id.* at ¶ 29) On that same date, Mr. Miller sent a mark-up of South State's forbearance agreement to Mr. Kampf and Mr. Tan at JUNO. (*Id.* at ¶ 31) Mr. Miller did not send the marked-up forbearance agreement to South State in light of ongoing negotiations between the parties as to that agreement. (*Id.*)

Also on December 31, 2018, Mr. Miller conducted a conference call with JUNO, in which he discussed his comments regarding the forbearance agreement; on this call, Mr. Miller also advised JUNO about a "Chapter 11 alternative" for SEMP. (*Id.* at ¶ 32) Following that conference call, JUNO informed Mr. Miller that it would have $900,000 available by mid-January 2019; JUNO asked Mr. Miller whether those funds should be advanced as subordinated

debt, or whether they should be reserved for debtor-in-possession financing. (*Id.* at ¶ 33) Mr. Miller did not respond at that time. (*Id.*)

Subsequently, JUNO told Mr. Miller that it was planning to advance funds to SEMP to pay down the line of credit debt that SEMP owed to South State. (*Id.* at ¶ 34) While Mr. Miller did not advise JUNO to take a different course of action at that time, later in 2019 Mr. Miller advised Mr. Kampf that, in hindsight, JUNO and SEMP should have obtained something in return from South State for paying down the line of credit. (*Id.* at ¶¶ 34-35)

On January 9, 2019, JUNO advanced SEMP $1.13 million. (*Id.* at ¶ 36) SEMP used $833,000 of these funds to pay off SEMP's line of credit with South State, which reduced SEMP's debt to South State to approximately $4.4 million. (*Id.*) JUNO advanced an additional $561,249.50 to SEMP in mid-February 2019. (*Id.* at ¶ 37) On February 28, 2019, SEMP decided to sign the forbearance agreement, and South State signed the intercreditor agreement. (*Id.*)

On March 6, 2019, Mr. Miller sent Mr. Kampf and Mr. Tan, as officers in JUNO, a UCC financing statement (the "UCC-1") naming SEMP as the debtor and JUNO as the creditor. (*Id.* at ¶ 39) Mr. Miller did not ask in which state SEMP was formed, nor indicate the state in which the UCC-1 would be filed. (*Id.* at ¶ 40) The next day, Mr. Tan and Mr. Miller exchanged e-mails regarding whether a UCC-1 should be filed as to SEMP. (*Id.* at ¶ 41) Mr. Miller apparently assigned the task of filing the UCC-1 to an associate at Rayburn Cooper, who then re-assigned the task to a paralegal. (*Id.*) On March 8, 2019, the UCC-1 was filed in the office of the North Carolina Secretary of State. (*Id.* at ¶¶ 41, 64)

From March 1, 2019 through May 6, 2019, JUNO advanced SEMP an additional $1,034,162, either in direct payments to SEMP or as payments to third parties on SEMP's behalf.

5

(*Id.* at ¶ 42) On May 1, 2019, South State placed a hold on SEMP's demand deposit account; the following day, South State terminated the forbearance agreement. (*Id.* at ¶ 43) As a result, on May 6, 2019, SEMP filed for Chapter 11 bankruptcy protection. (*Id.*)

JUNO alleges that because SEMP is an entity organized under the laws of the State of Delaware, the UCC-1 should have been filed in Delaware instead of North Carolina. (*Id.* at ¶ 65) Because the UCC-1 was filed in North Carolina, JUNO alleges that the UCC-1 failed to perfect JUNO's security interest in SEMP's assets. (*Id.*) And because a security interest that has not been perfected is subordinated to many third-party interests and is avoidable in a debtor's bankruptcy, Defendants' failure to file the UCC-1 in North Carolina allegedly damaged JUNO—because JUNO then was rendered an unsecured creditor in SEMP's bankruptcy. (*Id.* at ¶¶ 63, 67)

Any further relevant facts will be set out as needed in Section III.

**B.     Procedural History**

JUNO filed the Complaint on June 29, 2020. (D.I. 1) On September 11, 2020, Defendants filed the instant Motion in lieu of an Answer. (D.I. 6) On October 15, 2020, United States District Judge Maryellen Noreika referred this case to the Court to resolve all pre-trial matters up to and including expert discovery matters, pursuant to 28 U.S.C. § 636(b). (D.I. 9) Briefing on the Motion was completed on October 23, 2020. (D.I. 13)[2] The Court thereafter granted an unopposed request from JUNO to submit a supplemental answering brief regarding

---

[2]     JUNO's answering brief was 26 pages long, (D.I. 11), and so unless the Court is missing something, the filing appears to violate this Court's Local Rule 7.1.3(a)(4), which requires that such briefs be no longer than 20 pages. D. Del. LR 7.1.3(a)(4). That said, the brief has some strange spacing issues, and when you take those into account, it does not appear that Defendants were disadvantaged too much by the violation (nor did Defendants complain about this). So the Court will take no action, other than to simply remind counsel of the importance of following the Local Rules in this and all other regards going forward.

damages-related information, which only became available after briefing on the Motion had closed. (D.I. 26) On March 30, 2021, JUNO submitted its supplemental brief. (D.I. 28) On June 21, 2021, the Court heard telephonic oral argument regarding the Motion. ("Tr.")

## II. LEGAL STANDARD

The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III. DISCUSSION

In the Complaint, JUNO includes four Counts: Count I's claim for "Legal Malpractice—Negligence" against Rayburn Cooper, (D.I. 1 at ¶¶ 68-72); Count II's claim for "Legal

7

Malpractice—Negligence" against Mr. Miller, (*id.* at ¶¶ 73-77); Count III's claim for "Legal Malpractice—Breach of Contract" against Rayburn Cooper, (*id.* at ¶¶ 78-94); and Count IV's claim for "Legal Malpractice—Breach of Contract" against Mr. Miller, (*id.* at ¶¶ 95-107; *see also* D.I. 11 at 3 (JUNO asserting that Defendants "committed legal malpractice, both sounding in tort (Counts I and II) and breach of contract (Counts III and IV)")). For ease of reference below, the Court will refer to the claims in Counts I and II as the "negligence" claims and the claims in Counts III and IV as the "breach of contract" claims.

Defendants move to dismiss all Counts. The Court will take up Defendants' various arguments for dismissal below.

### A. Damages

In their Motion, Defendants had first asserted that all of JUNO's claims should be dismissed because JUNO has failed to plausibly allege that it sustained actual damages as a result of Defendants' alleged legal malpractice. (D.I. 7 at 12-13; D.I. 13 at 3-5) Defendants had contended that, when it came to damages, the Complaint only alleges that JUNO lost its status as a secured creditor—and that this does not, in and of itself, necessarily result in a monetary loss. (D.I. 7 at 12; D.I. 13 at 5) At the time that Defendants filed their opening and reply briefs in support of their Motion, "SEMP's Chapter 11 bankruptcy case [was still] pending" and so there had been "no liquidation of its assets[.]" (D.I. 7 at 12; *see also* D.I. 13 at 3) Accordingly, Defendants had argued that "JUNO is incapable of demonstrating that it has sustained a loss as a result of losing its status as a subordinate secured creditor" and that JUNO's claimed damages were "speculative." (D.I. 7 at 12; *see also* D.I. 13 at 3)

However, during oral argument, Defendants acknowledged that in light of the subsequent resolution of SEMP's bankruptcy proceedings as set out in JUNO's supplemental brief, (D.I. 28),

8

they would withdraw their damages-related argument, (Tr. at 46-47). Thus, the Court recommends that this aspect of Defendants' Motion be DENIED as MOOT.

### B. Lack of Standing Regarding the Negligence Claims (Counts I and II)

Defendants next argue, as to JUNO's negligence claims, that JUNO lacks "standing"[3] to assert those claims because JUNO was not in an attorney-client relationship with Defendants. (D.I. 7 at 13-16; D.I. 13 at 5-6) Pursuant to North Carolina law,[4] a plaintiff states a legal malpractice claim predicated on a theory of negligence by alleging facts that support that: (1) the attorney breached the duties owed to his client, and that this negligence (2) proximately caused (3) damage to the plaintiff. *Rorrer v. Cooke*, 329 S.E.2d 355, 366 (N.C. 1985); *Hampton v. Scales*, 789 S.E.2d 478, 484 (N.C. Ct. App. 2016). In North Carolina, a legal malpractice claim may be based on (1) privity of contract; or (2) third-party beneficiary contract liability. *Leary v. N.C. Forest Prods., Inc.*, 580 S.E.2d 1, 6 (N.C. Ct. App. 2003); *United Leasing Corp. v. Miller,* 263 S.E.2d 313, 316-18 (N.C. Ct. App. 1980). But North Carolina law also allows that a *non-client* plaintiff can bring a legal malpractice claim for negligence against an attorney—even where the plaintiff is not in privity of contract with the attorney nor a third-party beneficiary—under a third theory known as the "alternative tort theory." *Leary*, 580 S.E.2d at 6; *Miller,* 263 S.E.2d at 316-18; Tr. at 11-12. Such claims have been allowed if the defendant, by entering into

---

[3] The Court assumes that by its reference to a lack of "standing," Defendants are not referring to a lack of Article III standing (i.e., the Court's statutory or constitutional power to adjudicate a case), but instead to insufficiency of allegations regarding the elements of a legal malpractice claim. *Cf. Stevens v. Sharif*, No. 15 C 1405, 2017 WL 449175, at *3 (N.D. Ill. Feb. 2, 2017) ("Stevens first argues that the Estate does not have 'standing' because 'Stevens never represented the Estate in any capacity['] . . . . This of course is not actually an argument about constitutional standing, but is an argument that the Estate has failed to state a claim for legal malpractice because Stevens never had an attorney-client relationship with Haifa or the Estate.").

[4] The parties agree that North Carolina law supplies the substantive state law for this case. (D.I. 7 at 10; D.I. 11 at 17)

a contract with another party, places himself in such a relation toward the plaintiff that the law will impose upon the defendant an obligation, sounding in tort and not in contract, to act in such a way that the plaintiff will not be injured (e.g., to act in a non-negligent way). *Miller,* 263 S.E.2d at 317-18; *see also Leary*, 580 S.E.2d at 6. Whether a non-client third party may recover for an attorney's malpractice under this alternative tort theory depends upon several factors (the "six alternative tory theory factors"): "(1) the extent to which the transaction was intended to affect the [third party]; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the [attorney's] conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm." *Leary*, 580 S.E.2d at 6-7 (quoting *Miller*, 263 S.E.2d at 318).

During oral argument, JUNO clarified that its negligence claims are premised only on this alternative tort theory of liability. (Tr. at 13-14)[5] Thus, as to the negligence claims, JUNO does not have to establish an attorney-client relationship between it and Defendants. (Tr. at 57) And at this stage, accepting all of the allegations as true and construing the Complaint in the light most favorable to JUNO, the Court concludes that JUNO has plausibly alleged facts that are sufficient to state its negligence-based claims based on this theory.

To that end, the allegations establish that Mr. Kampf (and to some degree, Mr. Tan) had repeated communications with Mr. Miller on behalf of JUNO, sought and obtained legal advice from Mr. Miller while having no other counsel, and were not advised to retain separate counsel. More specifically, the Complaint alleges, *inter alia*:

- Both SEMP and JUNO participated in the initial conference call with Mr. Miller, (D.I. 1 at ¶¶ 23, 53);

---

[5] While the Complaint could have made it clearer that JUNO intended to press only this theory as to Counts I and II, the Court concludes that there is enough in the Complaint to allow for that inference. (*See* D.I. 1 at ¶ 46; Tr. at 37)

10

- On December 31, 2018, Mr. Miller had a conference call with JUNO to discuss his comments regarding the forbearance agreement and advise regarding a Chapter 11 alternative for SEMP, (*id.* at ¶ 32);

- JUNO shared confidential information with Mr. Miller regarding the pay down of the South State line of credit debt, and Mr. Miller discussed a bankruptcy alternative for SEMP that would have had JUNO advancing debtor-in-possession financing, (*id.* at ¶¶ 33-34, 53);

- Mr. Miller advised Mr. Kampf that in hindsight, JUNO and SEMP should have received something in return from SEMP for the pay down of the line of credit, (*id.* at ¶ 35);

- Mr. Miller did not advise JUNO to retain other counsel, (*id.* at ¶ 54);

- Following JUNO's initial conference call with Mr. Miller, JUNO no longer communicated with Boodell & Domanskis (the Chicago law firm that had regularly represented JUNO in the past), (*id.* at ¶ 53); and

- Mr. Miller sent Mr. Kampf and Mr. Tan, as officers of JUNO, the UCC-1 that named SEMP as the debtor and JUNO as the creditor, (*id.* at ¶ 39), and engaged in further e-mail discussions with Mr. Tan about the filing of the UCC-1, which was ultimately allegedly filed in the wrong jurisdiction (North Carolina), (*id*. at ¶¶ 41, 65).

These pleaded facts implicate at least some of the six alternative tort theory factors. That is, they could help to demonstrate that: (1) Defendants' conduct leading up to and including the filing of the UCC-1 was intended to directly affect not just SEMP, but JUNO as well; (2) it was foreseeable that JUNO could be harmed by Defendants' failure to file the UCC-1 in the correct state; and (3) Defendants' conduct is closely connected to the alleged injury. *United Leasing*, 263 S.E.2d at 318. And in light of these allegations, it is plausible that "JUNO, by and through Mr. Kampf and Mr. Tan, was relying on [Defendants] to represent [in a non-negligent

way] not only SEMP's interests in the workout negotiations and related matters, but those of JUNO's interests as well." (D.I. 11 at 19)[6]

The Court thus recommends that, with regard to JUNO's legal malpractice claims sounding in negligence, Defendants' Motion be denied on these "lack-of-standing" grounds.

## C. Breach of Contract (Count III and Count IV)

Lastly, Defendants make a number of arguments for dismissal of Plaintiff's breach of contract claims. (D.I. 7 at 16-18; D.I. 13 at 6-7)[7] The Court will first set out some further North Carolina state law that is relevant. Thereafter, it will address the merits.

As was noted above, in North Carolina a party can plead a legal malpractice claim premised on breach of contract if it was: (1) in direct privity of contract with the attorney or (2)

---

[6] During oral argument, Defendants argued that this alternative tort theory requires that a plaintiff plead facts establishing that a defendant has made a negligent misrepresentation to a third party non-client, which was designed to induce the third party to enter into a contract (and that JUNO's Complaint fails to do this). (Tr. at 25, 31) In support, Defendants noted that the *Leary* Court explained that with respect to the first of the alternative tory theory factors, "our courts have generally focused on whether the attorney's . . . conduct, based on a contractual agreement with the attorney's client, was intended or likely to cause a third party to act in reliance on the deficient service performed by the attorney for his client." *Leary*, 580 S.E.2d at 7; *see also Lamb v. Styles*, 824 S.E.2d 170, 178-79 (N.C. Ct. App. 2019). For one thing, the Court does not see how this language in *Leary* tracks the requirements of a typical negligent misrepresentation claim (or how it even requires the making of a misrepresentation to a third party at all). (Tr. at 34, 42) And even if *Leary* requires a showing that the third party was induced to act in reliance on the defendant's services, JUNO has still cleared the bar here. The Complaint's allegations, read together, could plausibly suggest that JUNO relied on Defendants' counsel (provided to JUNO and SEMP) regarding how and where the UCC-1 should be filed (and, in doing so, failed to take other action that could have resulted in the filing of the UCC-1 in Delaware, not North Carolina). (*See* D.I. 1 at ¶¶ 39-41, 55-56)

[7] To state a breach of contract claim under North Carolina law, a plaintiff must allege: (1) the existence of a valid contract; and (2) breach of that contract. *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000).

a third-party beneficiary of the attorney-client contract.  *United Leasing*, 263 S.E.2d at 317.[8]

"To establish a claim based on the third party beneficiary contract doctrine, a complaint's allegations must show: (1) the existence of a contract between two other persons; (2) that the contract was valid and enforceable; and (3) that the contract was entered into for [the plaintiff's] direct, and not incidental, benefit."  *Id.*  In assessing the third element, it is not enough that the contract in fact benefits the plaintiff, if, when the contract was made, the contracting parties did not intend for it to benefit the plaintiff directly.  *Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'ship.*, 518 S.E.2d 17, 25 (N.C. Ct. App. 1999).  A plaintiff is a direct beneficiary of a contract if the contracting parties intended to confer a legally enforceable benefit on that person.  *Id.*  In North Carolina, when a plaintiff seeks enforcement of a contract as a third-party beneficiary, the contract "must be construed strictly" against him.  *Id.* (internal quotation marks and citation omitted).

In the Complaint, JUNO is alleging that it was in privity of contract with Defendants or that, if it was not, it can nevertheless state a claim based on a third-party beneficiary contract theory.  (D.I. 11 at 20-23; *see also* D.I. 1 at ¶¶ 84-87, 97-100; Tr. at 14)  Defendants make two arguments in response as to why the breach of contract claims should be dismissed.

First, Defendants argue that JUNO cannot show that it was in privity of contract with Rayburn Cooper based on the express terms of the Engagement Letter, nor that JUNO was an intended third-party beneficiary to that contract.  (D.I. 7 at 16-18)  The Engagement Letter

---

[8] Under North Carolina law, in determining whether parties have formed an attorney-client relationship, courts look to the "conduct of the parties[,]" as such a relationship is not "dependent on the payment of a fee, nor upon the execution of a formal contract." *N.C. State Bar v. Sheffield*, 326 S.E.2d 320, 325 (N.C. Ct. App. 1985).  "The dispositive question, then, is . . . . whether defendant's conduct was such that an attorney-client relationship could reasonably be inferred."  *Id.*

13

provides that Rayburn Cooper would "represent [SEMP] . . . in connection with its current lender negotiations and related matters." (*Id.*, ex. B at 1)[9] And it notes that the engagement "is expressly limited to advising [SEMP] for the purposes set forth in this agreement and *does not include the representation of any individuals or other parties regarding these matters*." (*Id.* at 3 (emphasis added)) Nevertheless, it is also the case that the Engagement Letter is addressed to:

> [SEMP]
> c/o Phil Kampf, Managing Director
> Juno Investments, LLC
> [Mr. Kampf's JUNO-affiliated email address]

(*Id.* at 1) And it is signed by:

> Phil Kampf
> Managing Director
> Juno Investments, LLC

(*Id.* at 3; *see also* D.I. 1 at ¶ 26)

The Court concludes that it is plausible that JUNO was in privity of contract with Rayburn Cooper. To be sure, that the Engagement Letter explicitly states that Rayburn Cooper was not representing any party other than SEMP is a very helpful fact for Defendants on this score. But the fact that the Engagement Letter was both addressed to and signed by Mr. Kampf in his express capacity as Managing Director of JUNO is a supportive point for JUNO's argument. Alternatively, the Complaint's various allegations set out in Section III.B (regarding the conduct of JUNO and Defendants) render it plausible that one could infer that Rayburn Cooper had an implied contractual relationship to provide competent legal services to JUNO. *See supra* p. 15; *see also Kiousis v. Kiousis*, 503 S.E.2d 437, 440 (N.C. Ct. App. 1998) (noting

---

[9] Defendants attached the executed Engagement Letter as an exhibit to their opening brief. (D.I. 7, ex. B) The Complaint expressly references the Engagement Letter, (D.I. 1 at ¶ 26), and neither party suggests that the Court cannot consider the substance of the Engagement Letter in resolving Defendants' Motion.

that an implied-in-fact contract is one that exists by virtue of the parties' conduct, rather in any explicit set of words).[10] Plausibility—not a winning claim—is all that is required here.

The Court also concludes that the Complaint's allegations plausibly demonstrate that JUNO was a direct third-party beneficiary to a contract (i.e., the Engagement Letter) between SEMP and Rayburn Cooper. As JUNO points out, the Complaint pleads that: (1) JUNO was a necessary party to the subject lender negotiations and its rights as SEMP's guarantor were impacted by those negotiations; (2) both SEMP and JUNO were obligated on the intercreditor agreement regarding the loans from South State to SEMP; (3) all communications with Defendants were conducted by JUNO's officers; (4) JUNO ceased communications with its former attorneys following its initial conference call with Defendants; and (5) JUNO relayed confidential information to Mr. Miller regarding its relationship with SEMP. (D.I. 11 at 23 (citing D.I. 1 at ¶¶ 11, 12, 17, 19, 20, 23, 31, 32-35)) At this early stage of the case, these allegations (which show how closely connected JUNO was to Defendants' legal representation of SEMP and to the substantive legal issues involved, which in turn led to the filing of the UCC-1) could allow the inference that with the Engagement Letter, SEMP and Rayburn Cooper entered a contractual relationship that was also intended to directly benefit JUNO. *Cf. Hospira Inc. v. Alphagary Corp.*, 671 S.E.2d 7, 13 (N.C. Ct. App. 2009) (upholding a trial court's grant of summary judgment in favor of the defendant on plaintiff's third-party beneficiary breach of contract claim, but where the plaintiff had provided "no evidence to suggest that it was an intended beneficiary of the contract between Moll and [defendant,]" and the "invoices, e-mails,

---

[10] To the extent that during oral argument, Defendants argued that a breach of contract claim for legal malpractice under North Carolina law cannot be based on an implied contract, (Tr. at 15-17), they did not make that argument in their briefing, (*see* D.I. 13 at 7), and thus it is waived for purposes of the Motion.

and phone communications regarding the transactions are exclusively between representatives from Moll and [defendant]").

Second, Defendants argue that JUNO's breach of contract claim against Mr. Miller (in Count IV) should be dismissed because, as a matter of law, Mr. Miller was not a contracting party. (D.I. 7 at 18; D.I. 13 at 7) Here, Defendants assert that the Engagement Letter "clearly identifies" the parties as SEMP and Rayburn Cooper, and that Mr. Miller only executed the letter as an agent of Rayburn Cooper. (D.I. 7 at 18)[11] But Juno counters that the Complaint adequately alleges an implied contractual agreement between Mr. Miller and JUNO, based not on the Engagement Letter, but on Mr. Miller's *conduct* in acting as JUNO's attorney throughout the transactions at issue. (D.I. 11 at 24)

For the reasons discussed above, the Court agrees with JUNO. Although Count IV largely focuses on the possibility that a written contract (i.e., the Engagement Letter) existed between JUNO and Mr. Miller, the Count can also be read to suggest an that an implied contract existed between those parties. (D.I. 1 at ¶ 101 (alleging that Mr. Miller entered into a contract with JUNO by "oral and/or written agreement and/or by operation of North Carolina law")) And it is plausible that Mr. Miller's interactions with JUNO about various legal matters relating to SEMP and JUNO, set out above, could have created an implied contractual relationship between he and JUNO. Therefore, the Court recommends that Defendants' Motion to dismiss JUNO's breach of contract claim against Mr. Miller be denied.[12]

---

[11] According to North Carolina law, "[a]n authorized agent who enters into a contract on behalf of a disclosed principal generally is not personally liable to third parties [for breach of contract] since the contract is with the principal." *Opsitnick v. Crumpler*, No. 5:13-CV-835-D, 2014 WL 1682013, at *2 (E.D.N.C. Apr. 28, 2014) (internal citation omitted).

[12] Defendants additionally argue that as an alternative to dismissal, JUNO should be required to amend certain paragraphs of its Complaint which, according to Defendants, constitute

## IV.	CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' Motion be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: June 25, 2021

Christopher J. Burke

---

"vague, generalized, conclusory statements of wrongdoing that do not identify actual conduct imputed to the [] Defendants or harm sustained by JUNO[.]" (D.I. 7 at 19 (citing D.I. 1 at ¶¶ 69, 74, 88, 89, 101, 102 & 105)) Federal Rule of Civil Procedure 12(e) permits a defendant to move for a more definite statement if a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "Rule 12(e) has been interpreted to make relief available where a pleading is unintelligible . . . or the issues cannot be determined[.]" *Gross v. Weinstein, Weinburg & Fox, LLC*, 123 F. Supp. 3d 575, 581 (D. Del. 2015).

The Court does not agree that the Complaint is so "vague or ambiguous" that it prevents Defendants from reasonably framing a response. The counts of the Complaint incorporate by reference the preceding factual averments, which undisputedly set out the conduct at issue. (D.I. 1 at ¶¶ 68, 73, 78, 95) Moreover, most of the specific paragraphs that Defendants complain about *do* identify Defendants' offending conduct (albeit lumped in with some boilerplate-type language). (*Id.* at ¶ 69 (alleging that Defendants failed to file the UCC-1 in the correct state, failed to advise JUNO that Defendants had filed the UCC-1 in the wrong state while there was still time to fix this error, and failed to advise JUNO to file a UCC-1 statement in Delaware); *id.* at ¶ 74 (same); *id.* at ¶ 89 (same); *id.* at ¶ 102 (same); *id.* at ¶ 105 (same)); *see also* D.I. 11 at 3 (JUNO noting that "the Complaint clearly avers that the gravamen of the assertion of legal malpractice against Defendants is that Defendants filed the UCC financing statement . . . in the wrong state") (emphasis omitted)) Accordingly, the Court recommends that Defendants' request for a more definite statement pursuant to Rule 12(e) be denied.

UNITED STATES MAGISTRATE JUDGE